IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | CASE NUMBER: 21-mj-8318-GCS |
| JOSE BOBADILLO-ARMENTA ) | |
| Defendant. ) | |

## CRIMINAL COMPLAINT

I, Ayla Horlick, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

### COUNT 1

### POSSESSION WITH INTENT TO DISTRIBUTE FENTANYL

On or about October 4, 2021, in Madison County, within the Southern District of Illinois,

**JOSE BOBADILLA-ARMENTA,**

defendant herein, did knowingly and intentionally possess with intent to distribute 400 grams or more of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, a Schedule II controlled substance; all in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

### AFFIDAVIT

I, Ayla Horlick, am an investigative and law enforcement officer of the United States and I am empowered by law to conduct investigations of and to make arrests for offenses in violation of the Federal Narcotics Trafficking Laws, including Title 21, United States Code, Sections 841(a)(1) and 846. I have been a Special Agent with the Drug Enforcement Administration

1

(DEA) since December 2019 and I am currently assigned to an Enforcement Group with the Fairview Heights Resident Office, within the St. Louis Field Division. During the course of my law enforcement career, I have participated in multiple investigations involving controlled substances. I have also been involved in a variety of investigations of the trafficking and distribution of illegal narcotics. These investigations have led to the seizure of narcotics, weapons, and United States Currency. I have completed the Drug Enforcement Administration Basic Agent Training 16-week program. This specialized training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations. I am familiar with and have used methods of investigations which include electronic surveillance, interviews of suspects and witnesses, search warrants, arrest warrants, and Title III wire-taps. I work in collaboration with a group of DEA Special Agents and other law enforcement officers. These Special Agents and officers have participated in numerous drug investigations, which have resulted in the seizure of heroin, methamphetamine, crystal methamphetamine, cocaine, marijuana, and other controlled substances. My opinions and conclusions in this Affidavit are based on the investigation to date combined with my training and conversations with other experienced Special Agents and law enforcement officers on the investigative team.

        The statements contained in this affidavit are based on my investigation, as well as information derived from reports and interviews of the law enforcement officers and witnesses

named herein. This affidavit is meant to state facts sufficient to support a finding of probable cause that the named Defendant committed the charged offense and is not meant to contain a complete record of the entire investigation to date. In support of this Complaint, your affiant states as follows:

1. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe **Jose BOBADILLA-ARMENTA ("BOBADILLO-ARMENTA")**, Miguel Lara-Gamez, and others yet unknown to the investigators are engaged in the trafficking of fentanyl and other possible illegal narcotics in the Southern District of Illinois.

2. On October 4, 2021, members of the DEA Fairview Heights Resident Office (FHRO) received notification from Metropolitan Enforcement Group of Southern Illinois (MEGSI) that Illinois State Police (ISP) Troopers had conducted a traffic stop on a Chevrolet Colorado truck, bearing an Arizona registration, on Interstate 70 East-bound near mile marker 24, which is located in the Southern the District of Illinois. ISP Trooper Kenny Patterson advised your affiant and SA Callon Andrews that he cited "following too closely" as the traffic violation, which necessitated the traffic stop of the aforementioned vehicle. ISP Trooper Kenny Patterson identified the driver and registered owner of the vehicle as **Jose BOBADILLA-ARMENTA** and the passenger of the vehicle as Miguel Lara-Gamez. Trooper Patterson advised your affiant that upon execution of the traffic stop, he approached the passenger side of **ARMENTA's** vehicle and asked questions of BOBADILLA-ARMENTA and Lara-Gomez regarding the purpose of their travel. Trooper Patterson noted both occupants seemed extremely nervous, and the driver, **BOBADILLO-ARMENTA** had a blank stare and did not respond to the question. Trooper Patterson advised your affiant that after making contact with these individuals he called for a K-9

3

Unit due to the overpowering presence of air-fresheners, an agent he knows is used to mask the odor of narcotics, noting specifically there was an air-freshener hanging from the mirror, and one in the back seat. In addition to the air-fresheners, Trooper Patterson noticed a screwdriver that had been placed on top of the paperwork in the glovebox when he asked for the registration. Trooper Patterson advised your affiant that while he was waiting for the K-9 Unit to arrive, he brought the passenger, Lara-Gamez, back to his vehicle for officer safety purposes and to issue a warning.

3. Trooper Patterson stated he stopped the vehicle at approximately 9:17 a.m., called for the K-9 Unit, at approximately 9:21 a.m., and the K-9 unit arrived at 9:23 a.m. ISP Sergeant Eli Adams then deployed his K-9 unit during the traffic stop and the K-9 unit positively alerted to the presence of narcotics on **BOBADILLO-ARMENTA's** vehicle. After the K-9 alert, ISP Sergeant Adams performed a probable cause search of the vehicle and also noticed multiple air fresheners, the screwdriver in the glovebox, and what appeared to be tampering to the panels of the vehicle. ISP Sergeant Adams also searched the engine compartment of the vehicle, located under the hood, and noticed smudges around the air filter.

4. ISP Sergeant Adams utilized the screwdriver located within the vehicle to unscrew the top of the engine air filter and located a brick-shaped bundle, wrapped in duct tape, within the natural void of the air filter. Based on my training and experience, I know it is common practice for drug traffickers to conceal illegal narcotics within natural voids of vehicles and to utilize substances such as air fresheners as a way to mask odors emitted from illegal narcotics in efforts to evade law enforcement detection.

5. Trooper Patterson notified DEA agents after locating what appeared to be these illegal narcotics. Both parties were immediately arrested and relocated to the Silver Lake I-70 Rest Area-Eastbound, along with **BOBADILLO-ARMENTA's** vehicle, to ensure officer safety and to conduct a thorough search of the vehicle.

6. Additionally, Trooper Patterson informed DEA agents that upon the initial search of **BOBADILLO-ARMENTA's** person, Trooper Patterson located a pill-bottle and a small tin can in **BOBADILLO-ARMENTA's** pants pockets. This search was conducted after the K-9 alerted on **BOBADILLO-ARMENTA's** vehicle. The contraband found on **BOBADILLO-ARMENTA's** person was later field tested via TruNarc Analyzer by MEGSI SA Dylan Bruns. The TruNarc test revealed the contents within the pill-bottle and tin can both tested positive for methamphetamine.

7. At the rest area, Trooper Patterson located a second brick-shaped bundle, wrapped in duct tape, under the glove box, next to the cabin air filter within a natural void of the vehicle. Both brick-shaped bundles, wrapped in duct tape, were also field tested by MEGSI Sergeant Robert Patterson via TruNarc Analyzer. The field test again indicated positive results for fentanyl. The gross weight of the fentanyl concealed within Armenta's vehicle was weighed at 2.35 kilograms. It should be noted the fentanyl seized was subsequently transferred to a DEA Laboratory for testing, which also produced a positive result for fentanyl.

8. Based on the chain of events detailed, your affiant, along with DEA SA Callon Andrews, responded to the Silver Lake I-70 Rest Area-Eastbound to conduct interviews of **BOBADILLO-ARMENTA** and Lara-Gamez. MEGSI Sergeant Patterson informed agents that a Spanish-speaking officer was needed to assist with interviews as **BOBADILLO-ARMENTA**

only spoke Spanish and Lara-Gamez spoke some English, but his primary language was Spanish. Collinsville Police Department Detective Jose Cerna (bilingual in English and Spanish) assisted DEA agents with the interviews.

9. Detective Cerna advised **BOBADILLO-ARMENTA** of his Miranda rights. **BOBADILLO-ARMENTA** declined to answer questions and the interview was concluded. Detective Cerna then advised Lara-Gamez of his Miranda rights. Lara-Gamez acknowledged he understood and advised he would be willing to talk with agents. SA Andrews asked Lara-Gamez how he knew **BOBADILLO-ARMENTA**. Lara-Gamez replied that **BOBADILLO-ARMENTA** was a friend. Lara-Gamez further advised agents, including your affiant, that he lived in Phoenix, Arizona, and stated **BOBADILLO-ARMENTA** asked Lara-Gamez to travel with him to Boston to visit **BOBADILLO-ARMENTA's** family. When agents asked Lara-Gamez how long they would be in Boston, Lara-Gamez replied that he and **BOBADILLO-ARMENTA** planned to be in Boston for approximately one night and then would head back to Arizona.

10. When Lara-Gamez informed agents that he had only known **BOBADILLO-ARMENTA** for approximately one month, the undersigned explained to Lara-Gamez that his explanation as to his travel plans did not make sense. When Lara-Gamez was asked if he knew they were transporting fentanyl, Lara-Gamez replied negatively. However, when Lara-Gamez was asked if his fingerprints would be on the fentanyl found in the vehicle, Lara-Gamez replied affirmatively and noted that **BOBADILLO-ARMENTA** asked him to help put the packages in the vehicle. Lara-Gamez added that although he touched the packaging containing the fentanyl, he did not know what was inside the packaging. However, as the interview continued, Lara-

6

Gamez admitted to knowing that he and **BOBADILLO-ARMENTA** were transporting drugs. Moreover, when asked what he was getting paid to transport the fentanyl, Lara-Gamez stated he did not know an exact amount that he would be paid. Lara-Gamez told agents he would assist agents in their investigation, but maintained that **BOBADILLO-ARMENTA** arranged the trip and he was simply assisting **BOBADILLO-ARMENTA**. When investigators asked Lara-Gamez if he saw **BOBADILLO-ARMENTA** make phone calls during the trip, Lara-Gamez replied affirmatively, but did not know to whom **BOBADILLO-ARMENTA** had spoken.

11. At the conclusion of the interviews, both **BOBADILLO-ARMENTA** and Lara-Gamez were transported to the Madison County, Illinois, jail by MEGSI agent Dylan Bruns and Robert Patterson. **BOBADILLO-ARMENTA** and Lara-Gomez have since been charged in Madison County, Illinois, with state drug-related charges and remain in custody there pending trial.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Ayla Horlick
Special Agent
Drug Enforcement Administration

State of Illinois )
) SS.
County of St. Clair )

Sworn to before me, and subscribed in my presence on the 29th day of December, 2021, at East St. Louis, Illinois.

GILBERT C. SISON
United States Magistrate Judge

STEVEN D. WEINHOEFT
United States Attorney

DANIEL T. KAPSAK
Assistant United States Attorney